Filed 11/17/20  P. v. Mays CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077179 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN404816) |
| JOSIAH J. MAYS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge.  Affirmed.

Rachel M. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury convicted Josiah J. Mays of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) and found he personally used a dangerous or deadly weapon.  Mays admitted a serious felony prior conviction (§ 667, subd. (a)(1)) and a strike prior (§ 667, subds. (b)-(i)).

---

[1]     All further statutory references are to the Penal Code.

The court denied the motion to strike the "strike" prior but granted the motion to strike the serious felony prior. Mays was sentenced to a determinate term of eight years in prison.

Mays filed a timely notice of appeal.

Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) indicating she has not been able to identify any arguable issues for reversal on appeal. Counsel asks the court to review the record for error as mandated by *Wende*. We offered Mays the opportunity to file his own brief on appeal, but he has not responded.

## STATEMENT OF FACTS

The opening brief contains an accurate summary of the facts surrounding the offense. We will incorporate that summary for convenience; however, we will remove the victim's name and substitute initials in its place.

On the night of September 10, 2019, Encinitas resident L.P. was awakened around 11:00 p.m. by the sound of arguing. She heard a man's voice and tried to listen to understand what was happening but things quieted and she went back to sleep. She woke a second time when the yelling resumed; she recognized an angry sounding voice from the first time but could not distinguish the second voice. The voice sounded agitated and she thought she heard hitting. She called 911 because "it sounded like somebody was getting hurt." L.P. heard a smacking/spanking sound as though skin was hitting skin. She did not hear the sound of a chain. She went to her front yard; after calling 911, things got quiet. L.P. could see Glen Park from her house, but it was unlit and dark. As the deputies arrived, she saw a man stumble from the park and walk up the street yelling "Call the police." L.P. told the deputy someone had just exited the park and gave him the direction; the deputy went in the indicated direction.

2

That night, R.S. was by himself, out for a walk after leaving a friend's house where he'd been drinking alcoholic beverages over the course of the evening. His friend lived near Glen Park; R.S. left the house around 10:00 p.m. and went to Glen Park, entering through a parking structure and walking on the park sidewalk. There were no lights on in the park or the surrounding streets, but R.S. was familiar with the terrain from frequent walks there and could see where he was going because the moon was very bright.

As he walked, R.S. saw someone leaning over the railing of the footbridge and heard a male voice tell him "to get the F out of here." R.S. had never seen anything like that at the park and started walking by the picnic area. He didn't hear anything as he walked, but when he got to the covered picnic area R.S. heard a rattling chain and when he looked, someone was walking behind him. R.S. and the individual, identified as Mays, were separated by about 30 feet; R.S. was moving away from Mays, but Mays appeared to follow him. Mays was wearing a beige/black hoodie sweater with the hood pulled up on his head and black jeans.

When R.S. saw Mays, Mays did not say anything, but as Mays started coming towards him, R.S. said "please don't hit me," "please don't hit me." R.S. walked faster and faster; he looked back, saw Mays still there and heard a chain rattling. R.S. assumed Mays was going to attack him and tried to get away as fast as he could. He tried to run, but the grass was wet and he fell on his knees. After R.S. fell, Mays hit him on the head with a chain from two to three feet away.

R.S. put his hand over his head; blood was "gushing out," then someone else walked up and said, "leave him alone" and Mays stopped hitting him. R.S. turned around and got out of there as quickly as he could. He tried to

3

get his phone out of his pocket to call 911 but was too flustered; the next thing he knew, law enforcement was there. R.S. was not sure whether Mays stayed there, but thinks he may have walked away from the footbridge. The third person, the one who said to leave R.S. alone, also walked away.

Deputy Brett Fuller made contact with R.S. and took his statement. R.S. was shaken up, blood coming down the left side of head, and stains near the collar of his shirt. R.S.'s eyes welled up, and he started to cry a little bit. It was difficult for him to tell Fuller what was going on and Fuller advised him to "slow down a little bit." R.S. recalled the officers asking what happened, whether he could provide a description of the person who hit him, whether he could describe the object used to strike him and whether he would be able to identify someone in a lineup. He replied affirmatively and described his assailant's attire as "all like in black and a hoodie." He further told the officers his assailant had hit him two or three times with "like a whip thing made of steel."

Deputy Frank Ramos received a description of the suspect and arrived at the south side of Glen Park near the playground area and tennis court. He assessed the perimeter and began to walk around the park to attempt to locate a suspect. Along the south side of the tennis court Ramos looked in the bushes and noticed an object that seemed to be breathing. The object moved slightly and it looked like someone was there; Ramos saw there was a person in the bushes and commanded the individual to come out, "Come out with your hands up. I see you. If you don't come out with anything but your hands you may be shot." At first unresponsive, Mays emerged from the bushes when Ramos's partners arrived and issued more commands. Mays was detained and later arrested.

4

A search of the bushes revealed a backpack three to five feet from where Mays had been. The search also yielded a black baseball cap, a blue long-sleeve flannel shirt, and a chain. The chain and shirt were found together, about five feet away from where Mays was contacted. There was a piece of chain on the backpack that was similar to the chain found next to the shirt. Officers did not observe blood, particles, fibers, or hair on the chain.

The officers asked R.S. to participate in a curbside lineup and admonished him that he was not obligated to identify anyone. Seated in Fuller's patrol vehicle, R.S. saw the person police had detained and asked if the individual had a hoodie. Fuller instructed the officers to put the hood on the suspect and R.S. identified him as Mays, "Yes! 100 [percent]."

The paramedics on scene treated R.S.'s injuries—a cut on his head and scraped up knees and elbows from his fall. R.S. declined to go to the hospital with the paramedics, because he thought he could apply pressure to his head and the bleeding would stop. About two hours later R.S.'s head was still bleeding so he asked someone at the 7-Eleven next to the park to call the paramedics to take him to the hospital.

Physician's assistant Mark Beyer treated R.S. at the hospital. A physical examination revealed a laceration on R.S.'s scalp with some oozing, bleeding, and mild swelling, but no pulsatile bleeding, no contamination by foreign bodies, no depressed skull fracture, and no large hematoma. The laceration was on the upper left side of R.S.'s head towards the middle. It was three centimeters or one and three quarters inches long, five millimeters deep. Beyer did not notice any other injuries that needed to be treated. R.S. had "just an isolated laceration," with little swelling, no significant bruising, and no palpable deformity to suggest a skull fracture. Per the standard of care for trauma, and given R.S.'s story and mechanisms, Beyer performed a

CAT scan of R.S.'s head on suspicion of possible underlying brain/skull injury.  The CAT scan results were unremarkable.  Beyer treated the laceration with three staples and instructed R.S. to use Neosporin daily to keep the wound clean.  The injury was described as moderate, in that it required intervention in the form of the staple.  Beyer determined it was possible that a chain caused the injury, but there was nothing remarkable about the wound that would make him say a chain had caused it.

During the exam R.S. was "slightly slurring words" which led Beyer to believe he was "acutely intoxicated."  Beyer questioned what happened that evening because R.S. could not describe people or things around him.  Beyer questioned the chronicity of the events because he clinically finds that anyone who is showing signs of intoxication "may not be the best historian," and he found R.S.'s story bizarre.  R.S. told Beyer he'd had three alcoholic beverages, was experiencing nausea and headache (no dizziness or loss of consciousness) and believed nausea and headache were related to overconsumption of alcohol.

After treatment, R.S.'s pain lasted three to four days, diminishing each day until it was gone.  He felt dizzy and confused after being hit that night and took painkillers to manage the pain.

DISCUSSION

As we have noted appellate counsel has filed a *Wende* brief and asks the court to review the record for error.  To assist the court in its review and in compliance with *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel has identified issues that were considered in evaluating the potential merits of this appeal:

1.  Did the trial court err in denying Mays's motion to strike his strike prior; and

6

2.  Did the trial court err in failing to give an instruction for the lesser included offense of simple assault.

We have reviewed the entire record as required by *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Mays on this appeal.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

AARON, J.

DATO, J.